**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | Hon. Blanche M. Manning |
| v. | ) | |
| | ) | 04 CR 317 |
| **DANIEL BURTON, et al.** | ) | |

## MEMORANDUM AND ORDER

The Government charged Defendants Daniel Burton, Andre Harris, and Maurice Little with conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371. The present matter comes before the Court on Burton's motion to suppress incriminating statements made after he was allegedly arrested without probable cause. For the reasons set forth below, this Court DENIES this motion.

### BACKGROUND[1]

To understand how and why officers from the Chicago Police Department arrested Burton and his two Co-Defendants, the Court will first address the events leading up to the arrest. Four days prior to the arrest, on March 14, 2004, at approximately 2:10 p.m., an African-American male carrying a "black fanny pack" attempted to rob Banco Popular at 5900 W. Irving Park Road, in Chicago, Illinois. Fifteen minutes later, a lone African-American male carrying a "black fanny pack" entered the Plaza Bank on 6500 W. Irving Park Road (just down the road

---

[1] The facts in this opinion are taken from the suppression hearing and the parties' submissions and attachments thereto. For the most part, the relevant facts are uncontested.

from Banco Popular). After announcing that he was robbing the bank, the man put the money into his "fanny pack" and fled on foot.[2]

Four days later, on March 19, 2004, at 1:10 p.m., a lone African-American male with a black bag, similar to one used at the prior robbery, entered the Plaza Bank. When asked by a bank employee if he needed help, the man stated that was "just looking for someone" and immediately exited the bank. Still "on edge" from the robbery just four days earlier, the bank employees suspected that this man might be a bank robber. They therefore locked the doors and called the police to report their suspicions.

The bank employee who called 911 (which then broadcast the information to the police on the street) stated that a "suspicious black male" was in the bank "looking around." This individual had a "medium build" and "short black hair," was wearing "sun glasses, a gray hoody with stripe, and blue jeans," was carrying "a black pouch," and was last seen "walking towards the carwash in the rear" of the bank.

About five minutes after the above information was broadcast, two officers from the "burglary response" unit arrived at Plaza Bank. They immediately noticed "two black males" walking across the street towards the bank. One of the individuals matched the above description of the suspect, including the black pouch. Upon seeing the officers, the two males veered away from the bank and began walking towards the carwash next door.

The police then pulled next to the gentlemen and asked that they "stand by." One of the men, later identified as Defendant Burton, complied with this request. The other man,

---

[2]Based on bank surveillance photos, Defendant Harris was later identified as the suspect from both banks.

Defendant Little, who fit the description of the man in the bank, however, disregarded the officers' instructions and proceeded into the carwash. One of the officers then proceeded into the carwash, with his weapon drawn, to get Little, while the other officer, with his weapon holstered, remained with Burton.

Upon retrieving Little and the black pouch, which Little had attempted to dispose of in a garbage can, the officers proceeded to interview Little and Burton. The officers' suspicions were further raised when Burton stated that he did not know Little, while Little stated that he "barely knew" Burton. Burton, who gave the officers an identification card from Ohio, stated that he was "just dropped off" and was waiting for a ride. The black pouch, which contained bank brochures, also set off red flags that something was wrong.

After another officer arrived, the two officers went to investigate the parking lot from which it appeared that Burton and Little had been coming from. At this time the officer who was left with Burton and Little handcuffed them together so that they would not run away. Upon reaching the parking lot across the street, the two officers immediately noticed a man sleeping in the front passenger seat of a car with "temporary" Ohio license plates. Upon being questioned, the man in the car, later identified as Defendant Harris, stated that he "knew" the men across the street – Defendants Burton and Little. The officers also compared a surveillance picture from the prior (March 14th) robbery and concluded that the person in the picture very closely resembled Harris. At this time, based on the above facts, the officers decided to handcuff all three individuals and take them into the station for further investigation by the FBI. Upon being questioned, Burton made statements incriminating himself in the attempted robbery at Plaza Bank and other bank robberies.

After being charged with conspiracy to commit bank robbery, Burton brought the instant motion to suppress.

## ANALYSIS

Burton contends that use of his incriminating statements violate the Fourth Amendment because the police did not have "reasonable suspicion" for the initial stop nor "probable cause" to arrest him. The Fourth Amendment protects the right of the people to be secure in their persons and property against unreasonable searches and seizures. U.S. Const. Amend. IV. With respect to "seizures" of persons, the Fourth Amendment protects not only traditional arrests but also brief detentions. Terry v. Ohio, 392 U.S. 1, 16 (1968). Generally, there are three distinct categories of police-citizen encounters: (1) arrests, which must be supported by "probable cause"; (2) investigatory stops (Terry stops) – brief, nonintrusive periods of detention – which must be supported by a "reasonable suspicion" that a person has committed or is committing a crime; and (3) voluntary encounters, characterized by cooperation and non-coercive government questioning. United States v. Nobles, 69 F.3d 172, 179-80 (7th Cir. 1995).

To arrest a criminal suspect without an arrest warrant, the police must have probable cause, "under the totality of the circumstances, to reasonably believe that" the suspect committed or is in the process of committing a criminal offense. United States v. Gilbert, 45 F.3d 1163, 1166 (7th Cir. 1995). In determining whether the police had probable cause, the court must make "a practical, commonsense decision whether, given all of the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in [a] particular place." Id. This determination requires more than "mere suspicion," but does not "reach the level of virtual certainty." Id. In making a probable cause determination, courts consider whether and to what

extent the suspect resembles a description given by a witness to the alleged crime. United States v. Carpenter, 342 F.3d 812, 814-15 (7th Cir. 2003). Additionally, although not enough by itself, a suspect's "propinquity to others independently suspected of criminal activity" is relevant to the determination of probable cause. Id. at 815.

A police officer, who lacks probable cause for an arrest, may stop a suspect to briefly investigate the circumstances provoking the officer's suspicion that the suspect was or is about to engage in criminal activity (a Terry Stop). Terry v. Ohio, 392 U.S. 1 (1968). To make a Terry Stop, the officer must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion that the person is or was committing a crime. Id. at 21; United States v. Vega, 72 F.3d 507, 515 (7th Cir. 1995). To determine if the officer had a "reasonable suspicion" of criminal activity, the court must examine the "totality of the circumstances as they appeared to the officer at the time of the stop." United States v. Ocampo, 890 F.2d 1363, 1368 (7th Cir. 1989).[3] Where a suspect matches the general description given by a witness to the alleged offense, the police usually have "reasonable suspicion" to stop and question the suspect. Tilmon, 19 F.3d at 1225.

Here, after reviewing all of the evidence presented at the suppression hearing, this Court finds that the police had "reasonable suspicion" to stop Defendants Burton and Little, and then, after a brief but productive investigation, had "probable cause" to take all three Defendants into the station for further questioning. Within minutes after receiving the description of the

---

[3]In making a Terry Stop, the fact the police drew their weapons does not turn the stop into an arrest. Vega, 72 F.3d at 515; Ocampo, 890 F.2d at 1368. Instead, the court must examine whether the use of a weapon was reasonable under the circumstances. Id. at 1369. Likewise, the use of handcuffs during a stop is judged on whether it was reasonable for the officers' safety. United States v. Tilmon, 19 F.3d 1221, 1228 (7th Cir. 1994).

suspected bank robber, the police officers saw an individual (Little) precisely matching this description walking across the street <u>towards</u> the bank. Upon seeing the police, this person and another person (Burton), who appeared to be walking with the suspect, veered away from the police. After the police asked the two individuals to stop, the suspect matching the description attempted to hide in a car wash. At this point, given the description from the bank, the rash of bank robberies in the area, and the attempt by one of the persons to flee, this Court finds that the police had "reasonable suspicion" to briefly detain and question Burton and Little.

When questioned by the police, despite looking like they were walking together, one suspect denied knowing the other, while the other said he "barely" knew the other person. Burton, who gave an Ohio identification card, stated that he had just been dropped off and was waiting for a ride.

Once another officer arrived, the two officers walked towards where they believed Burton and Little were coming from when they were spotted crossing the street. During this time, the officer remaining with Burton and Little handcuffed them together (one handcuff on one wrist) to prevent them from leaving. Given that Little had already attempted to flee and that the remaining officer was a twenty-five year police veteran, it was reasonable for the officer to handcuff them to each other for a short period of time while the other officers continued their investigation.

Upon reaching the parking lot across the street from which they had seen Burton and Little walking, the two officers immediately noticed a man sleeping in the front passenger seat of a car with "temporary" Ohio license plates. One of the officers testified that this was very suspicious given that Burton had just given him an Ohio identification card. Upon being

questioned, the man in the car, later identified as Defendant Harris, stated that he "knew" the men across the street – Defendants Burton and Little.  The officers then compared a surveillance picture from the prior (March 14th) robbery and concluded that the person in the picture closely resembled Harris.  At this time, based on the above facts, the officers decided to handcuff all three individuals and take them into the station for further investigation by the FBI.

Given the totality of the above facts, this Court finds that it was more than reasonable for the police to believe that all three suspects – Burton, Little, and Harris – were involved in the bank robberies, and thus, they did not violate Burton's Fourth Amendment rights by taking him into the station for further investigation by the FBI.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendant Burton's Motion to Suppress [35-1]. It is so ordered.

ENTER: _____
                      **BLANCHE M. MANNING**
                      **U.S. DISTRICT COURT JUDGE**

**DATE: July 6, 2005**